RICHARD B. ROUSH, INC. Profit Sharing Plan, by Richard K. Roush, Trustee, Roush Insurance Group, Inc., as successor to Richard B. Roush, and Richard B. Roush, and Richard K. Roush, Plaintiffs

v.

THE NEW ENGLAND MUTUAL LIFE INSURANCE COMPANY and New England Financial, Defendants

No. 4:CV–99–0485.

United States District Court, M.D. Pennsylvania.

Oct. 16, 2001.

Michael A. Finio, Stephen F.J. Martin, Paige Macdonald–Matthes, Saul, Ewing, Remick & Saul, LLP, Harrisburg, PA, for plaintiffs.

E. Thomas Henefer, Stevens & Lee, Reading, PA, for defendants.

### *MEMORANDUM*

MCCLURE, District Judge.

### *BACKGROUND:*

Plaintiffs initiated this Employee Retirement Income Security Act ("ERISA")[1] action against defendants with the filing of a complaint pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

In their complaint, plaintiffs allege both state law and ERISA claims with respect to defendants' purported mismanagement of assets under an employee pension benefit plan. Defendants filed a motion to dismiss plaintiffs' state law claims based on ERISA preemption. In response, plaintiffs filed an amended complaint, including only two counts, one asserting a breach of fiduciary duty under ERISA (Count I) and the other alleging a violation of ERISA's prohibited transaction rules (Count II). The court subsequently denied as moot defendants' motion to dismiss.

---

1. 29 U.S.C. § 1001 et seq.

Plaintiffs have now moved for partial summary judgment as to liability on Counts I and II, and defendants have moved for summary judgment.

For the reasons that follow, plaintiffs' motion will be denied and defendants' motion will be granted.

## DISCUSSION:

### I. STANDARD OF REVIEW

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that *there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*" Fed. R.Civ.P. 56(c) (emphasis added).

... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. He or she can discharge that burden by "showing ... that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548.

Issues of fact are genuine "only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph,* 842 F.2d 689, 693–694 (3d Cir.1988) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Material facts are those which will affect the outcome of the trial under governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The court may not weigh the evidence or make credibility determinations. *Boyle v. County of Allegheny,* 139 F.3d 386, 393 (3d Cir.1998). In determining whether an issue of material fact exists, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Id.; White v. Westinghouse Elec. Co.,* 862 F.2d 56, 59 (3d Cir.1988).

If the moving party satisfies its burden of establishing a prima facie case for summary judgment, the opposing party must do more than raise some metaphysical doubt as to material facts, but must show sufficient evidence to support a jury verdict in its favor. *Boyle* 139 F.3d at 393 (quoting, *inter alia, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

### II. STATEMENT OF FACTS

The following claims are those applicable to the instant motion, and the facts relating thereto are essentially undisputed.[2]

---

**2.** The court's recitation of facts is, in large part, adopted from plaintiffs' Amended Com-

Plaintiffs are an ERISA-regulated profit sharing plan, Richard B. Roush, Inc. Profit Sharing Plan ("the Plan"); the two Plan trustees, Richard B. Roush and his son, Richard K. Roush; and the Plan sponsor, Roush Insurance Group, Inc. (successor by merger with Richard B. Roush, Inc.). Roush Insurance Group, Inc. and Richard B Roush, Inc. will be referred to collectively as "RBR Inc." Defendants are The New England Mutual Life Insurance Company and its successor New England Financial, referred to collectively as "New England."

In 1973, RBR Inc. established the Plan which was registered under section 401(a) of the Internal Revenue Code for the purpose of providing retirement benefits for the employees of RBR Inc.

In 1994, plaintiffs were approached by an insurance agent named Robert H. Todd ("Todd") about possibly transferring its profit-sharing plan invested with Massachusetts Financial Services ("MFS") to New England.[3] In reliance on representations by Todd and another New England representative named Joseph M. Malis ("Malis"), plaintiffs decided to transfer the Plan to New England. Thereafter, on December 6, 1994, Richard K. Roush ("Roush"), on behalf of RBR Inc., executed the New England Age Based Contribution Plus Profit Sharing Plan Adoption Agreement ("Adoption Agreement"). The Adoption Agreement was designed by New England, and constituted an amendment and restatement of RBR Inc.'s existing profit-sharing plan, whereby RBR Inc. adopted, in place of its former profit-sharing plan, the New England's Age Based Contribution Plus Profit Sharing Plan. The Adoption Agreement incorporated by reference The New England Age Based Contribution Profit Sharing Plan Basic Plan Document ("Basic Plan Document").

On March 14, 1995, plaintiffs completed an application for a group policy called the "Performer" ("the Policy") issued by New England under which the Plan's funds could be invested. The Policy was accepted by New England and given an effective date of March 29, 1995. The Basic Plan Document contemplates individual retirement accounts for the individual participants in the Plan which could be invested in various funds. The Policy, in turn, provides several different investment funds into which the Plan's trustees could direct the investment of the Plan funds—presumably based on investment elections communicated by the Plan participants to the trustees.

The Policy provided that New England would "establish and maintain ... a Deposit Fund to receive deposits of Plan contributions," and which would be "assigned to and made part of the assets" of New England's General Investment Account. The Policy also provided that the Deposit Fund would "be credited with deposits and interest ... as provided under this Policy." The Policy further stated: "Upon receipt of sufficient investment direction, the Deposit Fund and each Separate Investment Fund to which a portion of the deposit is directed by the Policyholder will be so credited as of its earliest possible Business Day or Valuation Date, as the case may be."

On May 22, 1995, at Todd's direction, Plan participants completed Selection Forms allocating their individual retirement accounts into the various Plan investment funds and gave these Selection Forms to Todd and Malis. On May 24,

---

plaint (record doc. no. 7).

**3.** Although Todd represented to RBR Inc. that he was an insurance agent for New England licensed to sell group annuity policies, he was purportedly not licensed by New England to do so.

1995, Plan assets in the amount of $961,394.89 were transferred to New England for investment and allocation into the investment funds selected by the Plan participants.

During the period between May 24, 1995 and September 30, 1995, Roush made numerous requests to New England for a complete accounting of the funds transferred to New England, and verification of proper allocation of the Plan assets into the various investment funds as directed by the Selection Forms.

On September 30, 1995, New England provided plaintiffs with statements of the Plan's funds. However, the information provided did not indicate the specific amounts transferred by New England into each investment fund for each Plan participant, nor did the information reflect the proper accrual of interest and earnings for each participant in each investment fund. After reviewing the information provided by New England, Roush made several telephone calls and sent letters to New England to inform them that the Plan participants' account balances were incorrect, that New England had failed to properly allocate the Plan assets as specified by each participant on the Selection Forms, and to demand that adjustments be made to reflect proper accrual of interest and earnings on each participant's account.

On or about November 7, 1995, New England sent the same information dated September 30, 1995 to Roush. After receiving the uncorrected statement, Roush again made numerous telephone calls and sent letters to New England demanding a proper accounting and adjustments to the Plan participants' accounts to reflect the interest and earnings which should have accrued since May 24, 1995.

On December 12, 1995, Stephen Chiumenti ("Chiumenti"), inhouse counsel for New England wrote plaintiffs and acknowledged plaintiffs' complaint about untimely investment allocations. Further, Chiumenti informed plaintiffs that upon confirmation that the investment elections had not changed, the Plan funds would be invested in accordance with those elections immediately and "without prejudice to your rights regarding the intervening delay." On or about December 12, 1995, New England transferred Plan assets in the approximate amount of $953,223.03 into the separate investment fund accounts designated by the Plan participants on their Selection Forms.

When New England transferred the Plan assets into the separate investment fund accounts, New England failed to make an adjustment to compensate the participants for the interest and earnings which would have been earned during the period from May 24, 1995 through December 12, 1995, if the Plan assets had been timely allocated to the proper investment funds.

After learning that the Plan assets had been allocated by New England, Roush demanded, on behalf of the Plan, a proper accounting to verify the accuracy of the amounts transferred to each investment fund for each participant, and proper adjustments for the lost interest and earnings. In spite of numerous demands, New England failed to provide to plaintiffs' satisfaction an accounting of the Plan assets or to credit the Plan participants' accounts for the lost interest and earnings. As a result, Roush, on behalf of the Plan and RBR Inc., sent written demands to New England for the transfer of all Plan assets, including an adjustment for the lost interest and earnings, to a new investment firm to be chosen by RBR Inc.

On August 1, 1996, Roush sent written notice to New England that all Plan as-

sets, including the adjustment for the lost interest and earnings, should be transferred from New England to Princor Financial Services. On August 2, 1996, New England acknowledged receipt of Roush's request for transfer of Plan assets, but stated that New England would do so only after subtracting a 5% surrender fee and would not make any adjustments for the lost interest and earnings. New England further stated that the only circumstance under which it would credit the Plan for the lost interest and earnings would be if RBR Inc. kept its Plan assets at New England and the Plan established a new policy with New England for a ten-year term.

On August 2, 1996, New England also notified plaintiffs that they were in default for not having paid an administrative fee to New England in the amount of $2,593, that payment of the administrative fee was required in order to "return the account to good standing" and that New England would take no further action, including record keeping services for the Plan participants or the preparation and/or filing of documents required by the IRS and U.S. Department of Labor, until the administrative fee was paid.

Plaintiffs refused to pay the administrative fee to New England unless or until New England made adjustments for its allegedly untimely and improper allocation of the Plan assets and demonstrated in an accounting that such adjustments had been made.

On August 2, 1996, Roush again demanded that the Plan assets be transferred in full, including a credit for the lost interest and earnings, without any reduction for surrender charges or penalties. New England again refused to transfer the assets to Princor Financial Services, as demanded. Between August 2, 1996 and November of 1998, Roush attempted to resolve this dispute through correspondence and telephone calls to New England with no success.

On several occasions, Plan participants contacted New England to request that monies be transferred between various investment funds or that monies be released because one of the Plan participants, Richard B. Roush, had reached retirement age. New England refused to honor the Plan participants' requests unless the Plan participants provided the specific dollar amounts to be transferred. It was, however, not possible for Plan participants to specify the dollar amounts for the transfers or release of monies because New England did not provide participants with a detailed accounting that correctly reflected the amount held by each participant or provide any updated information regarding earnings on the participants' monies in each investment fund.

Roush hired Keystone Retirement Corporation ("Keystone") to determine the amount of lost interest and earnings as a result of New England's conduct and to calculate the amount that should have been held by each Plan participant in each investment fund had New England timely and properly allocated the Plan's assets.

In June of 1998, plaintiffs and Keystone provided to New England detailed information demonstrating the alleged errors in the allocation of the Plan's assets and the interest and earnings that should have accrued had the Plan's assets been properly and timely allocated. According to Keystone, as of June, 1998, New England's errors in allocating the Plan assets amounted to a loss to plaintiffs in excess of $313,000.

Plaintiffs subsequently filed the instant action.

### III. PLAINTIFFS' MOTION[4]

Plaintiffs move for partial summary judgment on Counts I and II of their amended complaint as to the liability of New England. Specifically, plaintiffs' argue that summary judgment as to liability on Count I is appropriate where the facts demonstrate that New England is a fiduciary under 29 U.S.C. § 1002(21)(A) that breached its fiduciary duty to plaintiffs, and, as a result of that breach, directly and proximately caused plaintiffs to suffer actual harm. As to Count II, plaintiffs' assert that summary judgment as to liability is appropriate because the facts support a finding that New England engaged in prohibited transactions under ERISA.

New England opposes plaintiffs' motion on the following grounds: (1) that plaintiffs have failed to establish that New England was an ERISA fiduciary; (2) that even if New England was an ERISA fiduciary, plaintiffs have failed to establish as a matter of law that it breached fiduciary duties; (3) that even if New England breached fiduciary duties, plaintiffs have failed to establish that such breach caused plaintiffs' alleged damages; (4) that the statute of limitations bars plaintiffs' claims arising from the investment delay; (5) that plaintiffs' claims based on post–1995 events are substantively deficient; and (6) the facts do not support plaintiffs' claim of prohibited transactions.

### IV. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY ON COUNT I

#### 1. New England as a Fiduciary

■■■ 29 U.S.C. § 1002(21)(A) defines "fiduciary:"

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan *or exercises any authority or control respecting management or disposition of its assets,* (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A) (emphasis added). "A corporation may be a 'person' for purposes of ERISA § 3(21)(A)." *Confer v. Custom Engineering Co.,* 952 F.2d 34, 37 (3d Cir.1991) (citing 29 U.S.C. § 1002(9)).[5]

Under ERISA, not only the persons named as fiduciaries by a benefit plan, *see* 29 U.S.C. § 1102(a), but also anyone else who exercises any authority or control respecting management or disposition of plan assets under § 1002(21)(A)(i), is an ERISA "fiduciary." *Cf. Mertens v. Hewitt Associates,* 508 U.S. 248, 251, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) (pertaining to anyone who exercises *discretionary* control or authority over the plan's management, administration, and investment of plan assets—the first clause under § 1002(21)(A)(i)); *Curcio v. John Hancock Mut. Life Ins.,* 33 F.3d 226, 234 (3d Cir. 1994) (same). "Fiduciaries are assigned a number of detailed duties and responsibilities, which include 'the proper manage-

---

4. Notably, New England's claims in opposition to plaintiffs' motion are substantially the same as those in its motion for summary judgment. Thus, New England's motion will be discussed in the context in which it rebuts or opposes plaintiffs' motion.

5. 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

ment, administration, and investment of [plan] assets, the maintenance of proper records, the disclosure of specified information, and the avoidance of conflicts of interest.' " *Mertens*, 508 U.S. at 251–52, 113 S.Ct. 2063 (quoting *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142–43, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985)).

Here, New England argues in its opposing memorandum that it is not an ERISA fiduciary because its "involvement was limited to an arms length proposal made by Todd to have plaintiffs move from MFS to New England." Specifically, New England refers to the "activities of designing and selling the Basic Plan Document and the Performer Policy." We do not credit New England's contention on this point.

Although neither party points out for the court a named fiduciary of the Plan at issue, we find that New England qualifies as a "fiduciary" under subsection (i) of 29 U.S.C. § 1002(21)(A), given its management of Plan assets. In so finding, we look to guidance provided by the Third Circuit in *Bd. of Trs. of Bricklayers and Allied Craftsmen Local 6 of New Jersey Welfare Fund v. Wettlin Assocs. Inc.*, 237 F.3d 270 (3d Cir.2001). There, in discussing subsection (i) of § 1002(21)(A), the court stated:

> Subsection (i) of 29 U.S.C. § 1002(21)(A) differentiates between those who manage the plan in general, and those who manage the plan assets. These functions are set out in two clauses under subsection (i) separated by the conjunction 'or.' A significant difference between the two clauses is that discretion is specified as a prerequisite to fiduciary status for a person managing an ERISA plan, but the word 'discretionary' is conspicuously absent when the

text refers to assets. 'This distinction is not accidental—it reflects the high standard of care trust law imposes upon those who handle money or other assets on behalf of another.'

*Id.* at 272–73 (quoting *FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907, 911 (8th Cir.1994)) (further citation omitted). *See also IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir.1997) ("Any control over disposition of plan money makes the person who has the control a fiduciary.").

Here, under the Policy, it is clear that New England managed Plan assets. The Policy provided: "[New England] will establish and maintain ... a Deposit Fund to receive deposits of Plan contributions made ...." Plaintiffs' Appendix II, Exhibit 3. New England invested Plan assets in accordance with the "Investment Direction" under the Policy:

> [A]ny deposit received by [New England] without sufficient direction for its proper investment shall be held, with interest, at the rate then being offered to the last established accounting unit of the Deposit Fund until receipt of such direction from the Policyholder. Upon receipt of sufficient investment direction, the Deposit Fund and each Separate Investment Fund to which a portion of the deposit is directed by the Policyholder will be so credited as of its earliest possible Business Day or Valuation Date
> . . . .

*Id.* New England was responsible for processing Plan participants' Selection Forms, allocating assets as directed by those forms, and crediting the interest earned and income, gains or losses.

Given the foregoing, we find that New England is an ERISA fiduciary under the second clause of subsection (i) of 29 U.S.C. § 1002(21)(A).[6]

---

6. The record does not support a finding that

§§ 1002(21)(A)(ii) or (iii) apply to New Eng-

## 2. New England's Breach of Fiduciary Duties

ERISA § 404(a)(1)(B), as codified at 29 U.S.C. § 1104(a)(1)(B) "is the touchstone for understanding the scope and object of an ERISA fiduciary's duties." *Bixler v. Cent. Pennsylvania Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1299 (3d Cir. 1993). Specifically 29 U.S.C. § 1104(a)(1)(B) provides, in pertinent part: "a fiduciary shall discharge his duties with respect to the plan solely in the interest of the participants and beneficiaries ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

▓▓ "[I]n the exercise of these duties, the fiduciary may not materially mislead those to whom the duties of loyalty and prudence are owed." *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.,* 57 F.3d 1255, 1261 (3d Cir.1995). A fiduciary has a duty to disclose material information. *Bixler,* 12 F.3d at 1300. "[A] misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed retirement decision." *In Re Un-*

*isys Corp.,* 57 F.3d at 1264. The duty to inform "entails not only a negative duty not to misinform, but also an affirmative duty to inform when the [fiduciary] knows that silence might be harmful." *Id.*

29 U.S.C. § 1109 provides, in pertinent part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary . . . .

Plaintiffs' claim is that New England, as an ERISA fiduciary, breached its duty in numerous respects, and caused a loss to the Plan in an amount in excess of $313,000, as demonstrated by the following: (1) Todd misrepresented to RBR, Inc., by words and conduct, that he was an insurance agent for New England licensed to sell group annuity policies when he was not so licensed; (2) Todd and Malis, on behalf of New England, misrepresented that New England would properly and promptly allocate Plan assets according to

land. There is no evidence in the record that New England rendered investment advice for a fee or other compensation as required under subsection (ii), or that it exercised any *discretionary* authority or *discretionary* responsibility in the administration of the Plan as mandated by subsection (iii) (emphasis added).

It is clear that New England provided administrative services with respect to the Plan. When plaintiffs transferred the Plan from MFS to New England, they adopted a service contract offered by New England which provided Plan administration through New England Employee Plan Services—a division office of New England located in Cleveland, Ohio. Chiumenti N.T. 149, 1.1–11. Chiumenti

explained that pursuant to the service contract, New England Employee Plan Services was responsible for "the individual records, the plan, record keeping, [] government reporting and all of the administrative services that are necessary to maintain a qualified plan." *Id.* Based on the record, however, we do not find that New England exercised any "discretion" in the administration of the Plan. Therefore, New England's administration of the Plan is not enough to make it an ERISA fiduciary under § 1002(21)(A)(iii). *See Confer v. Custom Eng'g Co.,* 952 F.2d 34, 39 (3d Cir.1991) ("[P]ersons who perform purely ministerial tasks, such as claims processing and calculation, cannot be fiduciaries because they do not have discretionary roles.").

the investment selections of each Plan participant and would promptly credit any interest or earnings to each participant's account; (3) Todd and Malis misrepresented that New England would handle the Plan assets and group annuity policy in a professional and responsible manner; (4) in reliance on the representations by Todd and Malis, plaintiffs executed the Adoption Agreement and subsequently transferred assets in the amount of $961,394.89 to New England for investment and allocation into the investment funds selected by Plan participants; (5) New England failed to timely allocate Plan assets according to Plan participants' Selection Forms; (6) New England improperly allocated Plan assets and failed to abide by Plan participants' Selection Forms; (7) New England repeatedly failed to produce a full and complete accounting for the Plan and Plan participants as requested; (8) New England failed to credit Plan participants' accounts with the proper allocation of Plan assets and lost interest and earnings; (9) New England failed to adequately investigate the claims of plaintiffs with respect to the allocation of Plan assets and lack of a full and complete accounting; (10) New England failed to perform the proper record-keeping services and administrative tasks; (11) New England refused to promptly credit Plan participants for the errors discovered by plaintiffs and Keystone in New England's initial allocation of Plan assets; and (12) New England failed to return or transfer Plan assets as requested by plaintiffs. *See* Plaintiffs' Amended Complaint at ¶¶ 15, 16, 19–22, 43, 75, 76.

### A. The Investment Delay

■ As previously established, New England is an ERISA fiduciary as defined in 29 U.S.C. §§ 1002(21)(A)(i). As such, it owed to plaintiffs a specific duty of loyalty, care and prudence. We will address first plaintiffs' breach of fiduciary duty claim relating to the investment delay between the time Plan assets were transferred to New England in May of 1995, but were not invested according to Plan participants' Selection Forms until December of 1995. This claim encompasses ¶¶ 75, 76(a)-(g) of plaintiffs' amended complaint. For the reasons that follow, we believe that New England breached its fiduciary duty with respect to the six month delay in investment of Plan assets.

While there is no dispute that the delay in investment occurred, New England submits that plaintiffs' assertion is "substantively deficient" and shifts the blame onto alleged missing information from MFS.[7] The record establishes, however, that even though the Policy provided that Plan assets would be allocated with "sufficient direction" from Plan participants, and that such direction was provided to New England through the Plan participants' Selection Forms submitted to Todd on May 22, 1995, New England still failed to invest those funds.

Furthermore, although New England claims that it could not allocate the funds because of valuation information needed from MFS, there is no written documentation in the record to show that Todd, as the Plan's agent, or Dawn M. Loase ("Loase"), the Plan Administrator at New England's Employee Plan Services office in Cleveland, ever requested the information from Roush or MFS. Plaintiffs' Appendix II, Exhibit 13. Additionally, the

---

**7.** The crux of New England's argument is that plaintiffs' breach claim relating to the investment delay is time-barred by the statute of limitations set forth in ERISA § 413, 29 U.S.C. § 1113 (discussed below). Notably, the claim regarding the lack of information provided from MFS relates primarily to New England's contention that plaintiffs have failed to establish causation—an issue we need not address if the claim is untimely.

valuation report that New England was waiting to receive was purportedly received in September of 1995, yet Plan assets were not invested according to the direction of Plan participants until December of 1995. Moreover, New England failed to inform Roush that Plan assets were being held in a General Fund rather than being invested according to the options specified by Plan participants' Selection Forms. Loase N.T. 76, 1.6–11.

Although we are to view the facts in a light most favorable to New England, as the non-movant on this issue, New England has simply not put forth sufficient evidence or supporting case law to rebut a finding that it breached its fiduciary duty of care, loyalty and prudence owed to plaintiffs, as well as its fiduciary duty to inform, pertaining to the delay in investment of Plan assets. *See In re Unisys Corp.,* 57 F.3d at 1264. "A non-moving party may not rest upon mere allegations, general denials, or . . . vague statements . . . . IF the non-moving party's evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Bixler,* 12 F.3d at 1302 (quoting *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs,* 982 F.2d 884, 890–91 (3d Cir.1992)) (quotations and internal citations omitted).

We cannot—and will not—end our inquiry here and impose liability, as it is necessary for us to address New England's statute of limitations defense and, if necessary, a causal link between New England's breach and any actual harm suffered by plaintiffs.

### i. Statute of Limitations

Section 1113 of ERISA, 29 U.S.C. § 1113 states, in its entirety:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of

(1) six years after (A) the date of the last action which constituted part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such actions may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113; *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.,* 242 F.3d 497, 502 (3d Cir.2001).

New England argues that plaintiffs' claims relating to the investment delay are time-barred by the statute of limitations set forth in 29 U.S.C. § 1113. Specifically, New England argues that plaintiffs had "actual knowledge" of the alleged fiduciary violations by New England in 1995, more than three years before filing their complaint on March 26, 1999.

Plaintiffs contend that New England used fraud or concealment to hide its breach of fiduciary duty and, therefore, the six-year statute of limitations applies. Plaintiffs first submit that the issue of "actual knowledge" is in dispute and that they did not have actual knowledge of New England's breach because of the its effort to defraud and conceal pertinent account information from plaintiffs. Plaintiffs also argue that New England's alleged breach is an "act" or "omission" completed in December of 1995 under § 1113(1) and, therefore, either way—under the first and/or last provisions of § 1113—they had six years in which to file their complaint. Inconsistently, however, in the very next

section of their brief in opposition to New England's motion for summary judgment, plaintiffs contend that they obtained "actual knowledge" of the breach in August of 1996.

■ As noted by New England, the standards for determining "actual knowledge" under 29 U.S.C. § 1113(2) were articulated by the Third Circuit in *Gluck v. Unisys Corp.*, 960 F.2d 1168 (3d Cir.1992):

> [U]nder 29 U.S.C. § 1113(2), actual knowledge of a breach or violation requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists, which facts could include necessary opinions of experts ... knowledge of a transaction's harmful consequences ... or even actual harm .... We emphasize, however, that our holding does not mean that the statute of limitations can never begin to run until a plaintiff first consults with a lawyer.

*Id.* at 1177 (internal citations and quotations omitted). " 'Actual knowledge of a breach or violation' requires knowledge of all relevant facts at least sufficient to give the plaintiff knowledge that a fiduciary duty has been breached or ERISA provision violated." *Id.* at 1178. *See also Connell v. Trs. of Pension Fund of Ironworkers Dist. Council of N. New Jersey*, 118 F.3d 154 (3d Cir.1997).

■ In determining the appropriate statute of limitations provision under § 1113, we must first identify and define "the underlying ERISA violation upon which the fiduciary breach claim is founded." *Gluck*, 960 F.2d at 1178. Next, we must determine "the date of the last action which formed a part of the breach and the date of the plaintiff[s'] actual knowledge of the breach." *Id.*

Here, we have identified the key underlying ERISA violation upon which plain-

tiffs' breach of fiduciary claim is founded. Specifically, the court has identified and found that New England breached its fiduciary duties of loyalty and prudence provided by 29 U.S.C. § 1104(a)(1)(B) with respect to the investment delay of Plan assets from the date of transfer on May 24, 1995 to the date of investment on December 12, 1995.

Plaintiffs claim that the last date of New England's act or omission constituting breach was in December of 1995. Specifically, plaintiffs claim that the alleged breach was "not when New England failed to properly allocate the funds initially" but, rather, when New England "failed" to allocate the funds after discovering the problem in December of 1995.

Here, dealing first with the breach of fiduciary duty regarding the investment delay, we agree with New England that the record supports a finding that plaintiffs had "actual knowledge" of sufficient facts to give the plaintiffs knowledge that a fiduciary duty had been breached more than three years prior to the filing of their complaint.

Specifically, plaintiffs received notice of the investment delay in the fall of 1995. Roush, in his deposition, admitted: "Sometime in July [of 1995], I believe I got my first statement that upset me because I felt the numbers were wrong." Roush N.T. 49–50, 1.24–25, 1. By letter dated December 12, 1995, Chiumenti confirmed to plaintiffs that a delay in investments had occurred and that correct investment allocations would be made according to Plan participants' directions. Defendants' Appendix, Exhibit 8. Roush admitted that, prior to receipt of Chiumenti's letter, he had a conversation with Chiumenti about the investment delay. Roush N.T. 69, 1.8–10. Due to the investment delay, plaintiffs threatened and contemplated taking legal action in November and December of 1995.

Defendants' Appendix, Exhibits 6–7. Indeed, plaintiffs even contacted an attorney (David F. Aggers, Esquire) regarding New England's alleged "negligence" in failing to properly invest Plan assets and allocate the proper interest on Plan participants' accounts. *Id.*, Exhibit 7.[8]

It is clear that plaintiffs had "actual knowledge" under § 1113 of all the material facts, including the "harmful consequences" of the investment delay—*i.e.*, lost interest—necessary to understand that some claim for an ERISA violation or breach of fiduciary duty existed more than three years prior to filing the instant action. Given the support provided by the record, we do not credit plaintiffs' contention that the aforementioned facts only provided them with "constructive knowledge" and that "actual knowledge" was not obtained by plaintiffs until they received a letter outlining settlement options from Chiumenti dated August 5, 1996. Plaintiffs' Appendix II, Exhibit 21.

With respect to Todd, plaintiffs learned of the termination of Todd based on the revocation of his license before the end of 1995. Chiumenti N.T. 143–145; Roush N.T. 25, 1.10–19. Thus, it is also clear that plaintiffs had "actual knowledge" of Todd's termination more than three years prior to filing their complaint.

▮ Before finding plaintiffs' claim barred by the statute of limitations, however, it is necessary for us to consider whether plaintiffs have established that New England engaged in a course of conduct constituting fraud or concealment, making applicable the six-year statute of limitations period under § 1113.

▮ In determining whether an ERISA breach of fiduciary duty claim in-

volves "fraud or concealment" under § 1113, "[t]he issue raised ... is not simply whether the alleged breach involved some kind of fraud but rather whether the fiduciary took steps to hide its breach so that the statute should not begin to run until the breach is discovered." *In re Unisys Corp.*, 242 F.3d at 502. With respect to the "fraud or concealment" provision, the Third Circuit explains:

> [Section 1113]'s 'fraud and [sic] concealment' language applies the federal common law discovery rule to ERISA breach of fiduciary duty claims. In other words, when a lawsuit has been delayed because the defendant itself has taken steps to hide its breach of fiduciary duty, ... the limitations period will run six years after the date of the claim's discovery. The relevant question is therefore not whether the complaint 'sounds in concealment,' but rather whether there is evidence that the defendant took affirmative steps to hide its breach of fiduciary duty.

*In re Unisys Corp.*, 242 F.3d at 502 (quoting *Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544, 1552 (3d Cir.1996)). "[R]egardless of whether the acts to conceal the breach occur in the course of the conduct that constitutes the underlying breach or independent of and subsequent to the breach, there must be conduct beyond the breach itself that has the effect of concealing the breach from its victims." *In re Unisys Corp.*, 242 F.3d at 503.

In support of their fraud and concealment claim, plaintiffs refer to New England's failure to communicate on the issue of lost interest and various e-mails from Loase pertaining to the fact that she and various supervisors and/or employees of

---

**8.** Although consultation with a lawyer is not required to trigger "actual knowledge" under § 1113, *see Gluck*, 960 F.2d 1168, the fact supports plaintiffs' knowledge of the investment delay more than three years before this action was filed.

New England Employee Services Plan did not want to disclose to Roush that funds were not transferred according to Plan participants' direction and that certain accounts lost interest.[9]

 The plaintiffs' argument is flawed, however, in that these purported actions on behalf of New England did not "have the effect of concealing the breach from [plaintiffs]." *See In re Unisys Corp.*, 242 F.3d at 503. Indeed, as pointed out by New England, there was no actual concealment in this case where the investment delay was confirmed for plaintiffs by Chiumenti no later than December 12, 1995. Rather than engage in some "trick or contrivance," New England acknowledged the investment delay and offered to make the investment allocations in December of 1995 according to Plan participants' decisions and preserved plaintiffs' rights to pursue a claim for the delay if necessary. Defendants' Appendix, Exhibit 8 (noting that the investments would be made "without prejudice to [plaintiffs'] rights regarding the intervening delay.").[10] Plaintiffs raised questions and threatened to bring legal action more than three years before

filing their complaint. Furthermore, the Loase emails referred to by plaintiffs were dated in March of 1996, months after they first learned of the investment delay. Therefore, plaintiffs have put forth insufficient evidence of fraud or concealment for purposes of the six-year statute of limitations.

Accordingly, since plaintiffs had actual knowledge about the investment delay and firing of Todd more than three years before filing their complaint, their claims based on those events are time-barred. Thus, no genuine issues of material fact exist for a jury, and New England is entitled to summary judgment on ¶¶ 75, 76(a)-(g) in Count I of plaintiffs' amended complaint.[11]

## B. Failure to Provide a Complete Accounting [12]

 Plaintiffs assert that New England breached its fiduciary duty under ERISA by failing to conduct a thorough investigation and by failing to provide a "complete accounting." New England characterizes this claim as one hinging

9. The e-mails referred to include the following written by Loase: "Richard K. will be very upset when he finds out that the General Account wasn't emptied out and that he has lost interest on other accounts .... I would rather that Richard K. wasn't aware that these [funds] didn't get transferred as he wished." Plaintiffs' Appendix II, Exhibit 14. Additionally, Loase wrote to Rene Maynard, her supervisor at New England's Employee Plan Services, that: "It was admitted to Dave [McKeon] that no one has called Roush to explain the situation [regarding the incorrect allocations to funds based on Plan participants' Selection Forms]." *Id.*, Exhibit 16.

10. The issue of whether post–1995 settlement negotiations (referring to letters between Roush and Chiumenti, Defendants' Appendix, Exhibits 10–18) are admissible in this case under Fed.R.Evid. 408 is contested between the parties. Here, because the "compromise

or offer to compromise" is not submitted by plaintiffs to "prove liability for or invalidity of the claim or its amount," Fed.R.Evid. 408, New England's offer to settle the case is admissible. Plaintiffs claim that evidence of the settlement negotiations is admissible to prove New England's "fraud and concealment" and to "defend against [d]efendants' claims of undue delay in filing suit." Notably, however, plaintiffs have not provided factual support to identify how the settlement communications would prove the so-called fraud and concealment.

11. As such, it is unnecessary for the court to address the issue of a causal connection between the investment delay and any harm suffered by plaintiffs.

12. These claims are referred to by the parties as post–1995 claims to which no statute of limitations defense has been asserted.

solely on the alleged breach involving the investment delay. Plaintiffs, however, base their claim for failure to provide a complete accounting on the following: New England's inability to provide a definitive answer on when and how much was in the general account at the time of initial transfer from MFS; (2) New England's failure to properly invest some of the Plan proceeds in December 1995 when the alleged "correction" was done in December 1995; (3) New England's failure and refusal to provide Roush with a copy of the "correction" calculations used by New England in the December 1995 transfer; (4) the fact that on at least one occasion New England used Plan proceeds to pay a commission to an agent who was not even involved with the Plan; and (5) New England's refusal to credit the account with lost interest until the Plan executed a ten-year agreement.

Although the facts alleged by plaintiffs may support a claim for a breach of a fiduciary duty by New England, the only causal connection submitted by plaintiffs is that they suffered financial loss based on the aforementioned investment delay of Plan assets.

As such, we cannot impose liability under 29 U.S.C. § 1109 since there must be a causal link between "each such breach" and the losses allegedly incurred. Because plaintiffs have failed to allege—or submit evidence to establish—that New England's purported failure to provide a complete accounting caused the losses alleged, plaintiffs' motion for partial summary judgment will be denied as to ¶ 76(h) of Count I of their amended complaint. Given the absence of evidence, there is no genuine issue of material fact to be decided by a jury and New England is entitled to summary judgment on plaintiffs' "fail-ure to provide a complete accounting" claim.

## C. Failure to Accept Keystone's Calculations, Refusal to Provide Administrative Services, and Failure to Return Plan Funds

■ Plaintiffs also allege that New England breached its fiduciary duty by refusing to provide record keeping and administrative services relating to the preparation and filing of IRS and/or Department of Labor documents; refusing to accept Keystone's calculations regarding the errors in New England's initial allocation of Plan assets; and failing to return or transfer Plan assets as requested by plaintiffs.

As with their claim alleging a breach of fiduciary duty by failing to provide a "complete accounting," plaintiffs have failed to allege, or establish, a causal nexus between these alleged breaches of fiduciary duty and any losses incurred by the Plan. As mentioned previously, their only "cause" argument pertains specifically to the delay in investment of Plan assets between May of 1995 and December of 1995. Thus, even if we found sufficient facts to support a finding that New England did breach its fiduciary duty as claimed by plaintiffs, we cannot impose liability without a showing of a causal connection between the claimed breaches and actual harm to the Plan resulting therefrom.

Accordingly, plaintiffs' motion for partial summary judgment will be denied as to ¶¶¶ 76(i), (j), and (k) in Count I of their amended complaint. Because plaintiffs' have failed to put forth sufficient evidence on the issue of causation, there is no genuine issue of material fact to be decided by a jury and New England's motion for summary judgment will be granted as to these claims.

## V. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY ON COUNT II

■ In Count II of their amended complaint, plaintiffs contend that New England engaged in "prohibited transactions" within the meaning of ERISA section 406, 29 U.S.C. § 1106. Specifically, plaintiffs claim that New England violated § 1106 for the "benefit and in the interest" of New England in the following ways: (1) refusing to credit Plan participants' accounts with the lost interest and earnings, unless the Plan executed a new ten-year policy with New England; (2) refusing to credit Plan participants' accounts according to the proper allocation of Plan assets according to participants' Selection Forms, including lost interest calculations; (3) refusing to transfer Plan assets from New England to a financial services, investment or insurance company of the plaintiffs' choice, unless penalties and surrender charges are imposed and Plan participants' accounts are not credited with the lost interest and earnings; (4) refusing to perform record keeping services and administrative tasks relating to, among other things, the preparation and filing of IRS and or Department of Labor (DOL) documents, unless plaintiffs paid to New England an additional administrative fee of $2,593; and (5) refusing to promptly credit Plan participants for the errors discovered by plaintiffs and Keystone in New England's initial allocation of Plan assets.

New England, relying on *Lockheed Corp. v. Spink,* 517 U.S. 882, 893, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996), argues that plaintiffs' prohibited transaction claims fail as a matter of law because they are not the type covered by § 1106(a).

■ In *Lockheed Corp.,* the United States Supreme Court explained that "Congress enacted § 406, [29 U.S.C. § 1106] to bar categorically a transaction that [is] likely to injure the pension plan." *Id.* at 888, 116 S.Ct. 1783 (citing *Comm'n v. Keystone Consol. Indus., Inc.,* 508 U.S. 152, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993)). Specifically,

> [t]hat section mandates, in relevant part, that '[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect ... transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.'

*Lockheed Corp.,* 517 U.S. at 888, 116 S.Ct. 1783 (citing 29 U.S.C. § 1106(a)(1)(D)). The Court further elaborated that § 406(a) prohibits fiduciaries from engaging the plan in transactions such as

> the 'sale,' 'exchange,' or 'leasing' of property, 29 U.S.C. § 1106(a)(1)(C); the 'lending of money' or 'extension of credit,' § 1106(a)(1)(B); the 'furnishing of goods, services, or facilities,' § 1106(a)(1)(C); and the 'acquisition ... of any employer security or employer real property,' § 1106(a)(1)(E), with a party in interest.

*Id.* at 893, 116 S.Ct. 1783. "[I]n order to sustain an alleged transgression of § 406(a), a plaintiff must show that a fiduciary caused the plan to engage in the alleged unlawful transaction. Unless a plaintiff can make that showing, there can be no violation of § 406(a)(1) to warrant relief under the enforcement provisions [found in ERISA § 409, 29 U.S.C. 1109(a)]." *Id.* at 888–89, 116 S.Ct. 1783.

In this case, plaintiffs state that not only is New England an ERISA fiduciary, but it is also a "party in interest" given the various services provided to the Plan under the Policy. For purposes of our analysis of plaintiffs' "prohibited transactions" claim, we accept as true that contention. *See* 29 U.S.C. § 1002(14)(B).

Plaintiffs' claims pertaining to administrative services are unclear to the court. On one hand, plaintiffs argue that New England breached its fiduciary duty by failing to perform adequate record keeping and administrative services. On the other hand, plaintiffs attempt to argue that it was a "prohibited transaction" for New England to provide administrative services for the Plan through August of 1996. Either way, this claim fails under § 1106(a), as do plaintiffs' other prohibited transactions claims, since plaintiffs have failed to show that New England caused the Plan to engage in an alleged unlawful transaction. *See Lockheed,* 517 U.S. at 888–89, 116 S.Ct. 1783. Indeed, New England is correct that none of the aforementioned actions alleged by plaintiffs is of the type of "transaction" covered by § 1106(a).

 Furthermore, § 1106(a) " 'only outlaws transactions such as furnishing of services . . . between the plan and a party in interest' where the fiduciary 'knows or should know' that they are prohibited." *Marks v. Independence Blue Cross,* 71 F.Supp.2d 432, 438 (E.D.Pa.1999) (citations omitted). Plaintiffs have not alleged—or produced any evidence—that New England caused the Plan to engage in any unlawful transaction, let alone one which it knew or should have known was unlawful under § 1106(a).

Plaintiffs, recognizing the strength of New England's argument, next direct the court to shift its analysis to the applicability of § 1106(b).

 "Section 1106(b) outlines per se prohibitions against self-dealing transactions that have a 'high probability of corruption and loss of plan assets.' " *Marks,* 71 F.Supp.2d at 437 (citation omitted). Although stating that "§ 1106(b) [is] clearly . . . applicable" to its claims, plaintiffs fail to establish how their bald allegations fit within the provisions of § 1106(b). With-

out more, the court cannot find plaintiffs' claim viable against New England's motion for summary judgment.

Plaintiffs have failed to allege adequately or produce any evidence of a prohibited transaction as defined under § 1106 of ERISA. Therefore, plaintiffs' motion will be denied as to Count II, and New England is entitled to summary judgment on Count II of plaintiffs' amended complaint, as there exists no genuine issue of material fact to be decided by a jury.

## VI. CONCLUSION

For the foregoing reasons, plaintiffs' motion for partial summary judgment will be denied and New England's motion for summary judgment will be granted.

An appropriate order will issue.

## *ORDER*

For the reasons set forth in the accompanying memorandum, **IT IS ORDERED THAT:**

1. Plaintiffs' motion for partial summary judgment as to liability (record doc. no. 27) is denied.

2. Defendants' motion for summary judgment (record doc. no. 28) is granted pursuant to Fed.R.Civ.P. 56(c).

3. The clerk is directed to enter final judgment in favor of defendants and against plaintiffs and to close the case file.